UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NANCY GLEIS, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:04 CV 2217 (DFM) |
| vs. | : | |
| | : | |
| OFFICER JOHN BUEHLER, | : | January 6, 2006 |
| SGT. SEAN COONEY, | : | |
| and CITY OF STAMFORD, | : | |
| | : | |
| Defendants. | : | |

### AFFIDAVIT OF PLAINTIFF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I, Nancy Gleis, having been sworn, depose and say:

I submit this affidavit in support of my motion for summary judgment and for the purpose of clarifying and disputing, under oath, several statements contained in the exhibits which were submitted with the parties' Stipulation of Facts and Admissibility/Authenticity of Documents.

1. The statements made in the "Statement of Facts" portion of my summary judgment motion, filed herewith, are true and accurate.

2. The statements made in my May 12, 2002, fax (Exhibit C) are true and accurate, other than the date of the alleged incident inadvertently being referred to as May 9 rather than the correct date of May 10.

3. After the night of May 10, 2002, when the defendants came to my townhouse as I was getting ready for bed, I made several attempts to contact and cooperate with Sgt. Cooney (defendant Buehler's supervisor), including the following examples from my May 10, 2002 fax (Exhibit C):

   A. On page 3 of my fax, I stated that, "I called you [Sgt. Cooney] yesterday morning [May 11, the day after the alleged incident] and was told that you would be in at 3:00."

   B. "When I called at 3:00 I was told that you weren't there and wouldn't be working yesterday or today [May 12].

   C. On page 3 of my fax I told Sgt. Cooney that if "there is a summons which I need to pick up, I wanted to stop by...."

   D. Page 3 of my fax also states: "When you receive this fax, would you please leave a message for me as to a good time to call you."

4. Sgt. Cooney never called me at any time, either in response to my phone messages or the request in my fax.

5. Sgt. Cooney admits that he never contacted me after the night of May 10, 2002, when he called me from his cell phone as he was outside my townhouse with Officer Buehler and I allegedly "rebuffed" them by not agreeing to go outside or let them inside. (Ex. I, p. 112). I didn't refuse to go outside (or let them inside) until after Officer Buehler refused to remove a toothpick from his mouth and refused to turn off the flashing emergency lights on the patrol cars that kept arriving.

6. Officer Buehler told me that if I didn't come outside, he would have my car towed away.

7. In addition to the emergency flashing lights of the patrol cars, some of the patrol cars were parked so that the headlights were shinning into my windows.

8. On May 14, 2002, two days after the alleged Stop & Shop incident, having not heard from Sgt. Cooney in response to the request in my May 12 fax (Exhibit C) that he contact me, I called Sgt. Cooney (1) to confirm that he had received my fax advising him of the exculpatory Stop & Shop surveillance tapes; (2) to advise him that my plans to be in Massachusetts that week had changed; (3) to discuss the witness mentioned in my fax who would be seen (together with her vehicle and perhaps license plate number) on one of the surveillance tapes; and (4) to repeat the statement in my fax that if there was a document that needed to be served on me, I would go to the police department to accept service.

Sgt. Cooney responded by telling me that ***there was no reason for me to come to the police station since "we have your fax, which is your statement" and there was no summons***

***or warrant to be served on me.*** Based on Sgt. Cooney's confirmation that he had received my fax advising him of the exculpatory surveillance tapes, and based on the statements he made to me during that conversation as stated above, I assumed the matter had been "dropped." Sgt. Cooney abruptly ended the conversation when I asked him Officer Buehler's name, which I didn't know at the time, because I intended to write a letter about his unprofessional conduct on the night of the alleged Stop & Shop incident when he came to my townhouse.

9. Prior to October 30, 2003, when the defendants testified at the evidentiary hearing, I had never met either Officer Buehler or Sgt. Cooney, other than to speak with Officer Buehler through a window screen on the night of the alleged Stop & Shop incident.

10. The list of documents and statements contained in Exhibit F are true and accurate. Exhibit F is a list of all of the documents in the State Attorney's file that I was given to inspect when I went to their office on January 2, 2003. My fax, advising defendant Cooney of the exculpatory surveillance tapes at Stop & Shop, was not attached to the warrant affidavit, nor was it any where in the State Attorney's file. I handwrote two duplicate originals of this list and Susan Mendela, who is employed by the State Attorney's office, agreed to put one of the duplicate originals in the State Attorney's file.

11. Contrary to Officer Buehler's statement at the evidentiary hearing that I refused to cooperate when I was arrested, nothing could be further from the truth. I was extremely polite and cooperative when I was arrested and during the entire time I was in custody. (Officer Buehler was not even on duty when I was being arrested and processed.)

12. I am aware of at least a dozen Stamford police officers who knew that I had sent a fax to Sgt. Cooney, advising him of the exculpatory surveillance tapes at Stop & Shop, and that the warrant for my arrest had been obtained even though probable cause did not exist. None of them offered to intervene, and apparently none of them did intervene, since my arrest and prosecution continued for more than two years.

13. Officer Buehler stated in the warrant affidavit that he was familiar with me as a result of a "prior incident" involving "other officers." As briefly addressed in my original pro se motion filed shortly after I was arrested, that "other incident" consisted of the following:

In approximately January of 1999 I purchased a townhouse in Stamford. While at the Stamford library, I met a woman who said that she had just moved to Connecticut from New York and was looking for a job. Since she had what appeared to be excellent references, I told her that she could stay in one of the empty bedrooms on the third floor of my townhouse while she looked for a job and a place to live. Months later, when she refused to move out, I arranged for a marshal to serve an eviction notice -- simply as a reminder that she needed to start looking for another place to live. For some reason, several police officers accompanied the marshal. The eviction notice was served and they all eventually left, but only after referring to the woman and myself as "sweetheart" or "honey", chewing gum, and otherwise conducting themselves in what I considered to be a very unprofessional manner. The following day I contacted the police chief's office and suggested that someone speak with the officers about what conduct is appropriate when dealing with citizens.

This inconsequential matter apparently wasn't as inconsequential as I thought it was, since Officer Buehler remembered it three years later and made reference to it in his warrant affidavit

as my having been involved in a "prior incident" with the police.

14. On the night of the Stop & Shop incident, when Officer Buehler came to my townhouse and I decided to speak with someone on the phone as opposed to opening the door for Officer Buehler, I called the Stamford Police Department and spoke with Sgt. Petrone. At some point during the discussion, he said, "Hold on babe", at which time I hung up the phone, called my neighbor, Bill Blank, and asked him to go outside and speak with Officer Buehler.

Sgt. Petrone subsequently twice apologized to me for having used the word "babe" -- but only after I mentioned in my May 12, 2002, fax to Sgt. Cooney (Exhibit C) that I was sure that any tape recording of my call to the police that night would reflect that Sgt. Petrone did, in fact, use the word "babe." [1]

15. Reference is made in the evidentiary hearing transcript to my having twice been arrested by the Stamford police, in addition to the "Stop & Shop" arrest. Although those matters were dismissed and expunged in accordance with Connecticut's "erasure statute," I would like the record in the within matter to reflect what those arrests involved:

A. Many Stamford police officers knew me (and my car) by sight, simply because they would often park behind a fence, directly in front of my townhouse, facing my front

---

[1] [Plaintiff only feels that this is relevant because Sgt. Cooney testified that he didn't give plaintiff's fax any credibility because he considered plaintiff's fax to be "bizarre." According to his testimony, he thus concluded that the "author of the fax" must be irrational which, he says, is why he didn't give plaintiff's fax any credibility and didn't, therefore, view or obtain the surveillance tapes. Since plaintiff has been assured by everyone who has read her fax (except the defendants and Michael Colombo) that there is nothing at all "bizarre" about the fax, plaintiff assumes that Sgt. Cooney is referring to the criticism in her fax of a few Stamford police officers, including their propensity for referring to female citizens in condescending terms.]

door and garage while waiting to "catch" drivers who often made illegal U-turns directly in front of the townhouse complex. On the morning I was arrested regarding the Stop & Shop warrant (October 23, 2002), I had stopped my car to ask a Stamford officer for directions. He was directing traffic at an intersection where construction workers were using jackhammers to remove a sidewalk. The noise from the jackhammers made it very difficult to hear what anyone else was saying. When I asked him if he could tell me "which way Newfield Avenue is," he pointed north and I assumed he was pointing towards Newfield Avenue. (He contends that he was pointing for me to turn the corner and then pull over to the curb. I couldn't hear what he was saying because of the noise of the jackhammers.) As I was turning the corner, another officer who was standing near the first officer, pointed that he wanted me to pull my car over to the sidewalk. When I did, the first officer approached my car and asked me if I was aware that there was an old warrant for my arrest.

I was arrested with respect to the old Stop & Shop warrant, and while I was sitting in a jail cell with a $25,000 bail (waiting for a bail commissioner to arrive who, I was told, had authority to release me on my own recognizance), Sgt. Robert Latosh prepared an "Affidavit For Arrest Without Warrant" charging me with reckless driving when I turned the corner at the construction site that morning after stopping my car to ask for directions. An additional bail was set at $250.00 and later that afternoon raised to $500.00, even though I was already in custody with a $25,000 bail regarding the Stop & Shop matter. [2]

---

[2] Sgt. Latosh had stood next to defendant Cooney while I was being processed on the Stop & Shop warrant. It was Sgt. Latosh who set my bail at $25,000 on the Stop & Shop warrant, even though he had just obtained a

A year later, while former Asst. State's Attorney Michael Colombo was sitting in a courtroom with me and my defense attorney, waiting for the evidentiary hearing to begin regarding the Stop & Shop charges, Mr. Colombo (who had both files with him -- the Stop & Shop file and the motor vehicle file) hand-wrote an additional charge in the motor vehicle file, without mentioning to me, my attorney, or the court that he was doing so. He added the charge of "engaging in a police pursuit" -- claiming that when I assumed the officer at the construction site was pointing north towards Newfield Avenue, he was actually pointing for me to pull over to the curb, and that it was only after the second officer, standing next to the first officer, "pursued me" and pointed to the curb that I pulled over.

The first time anyone (other than Mr. Colombo) knew about this "engaging in a police pursuit" charge was some time in 2004 when I was waiting for my attorney in the Stop & Shop matter to arrive at the courthouse and I decided to look at the Clerk's file and discovered what Michael Colombo had done. This matter was dismissed with prejudice and has been expunged pursuant to Connecticut's erasure statute.

B. I was next arrested, by defendant Buehler, in court, at the conclusion of the Stop & Shop evidentiary hearing testimony on October 30, 2003, for allegedly "evading responsibility" (a misdemeanor). Officer Buehler had called me the previous day (from

---

computerized background check on me that said "no prior arrests" and even though he admittedly knew I owned a townhouse two blocks from the police department -- two significant factors in determining how much bail, if any, should be assessed (no criminal history and owning property in the community).

Michael Colombo's office) and insisted that I meet with him because, he said, he wanted to come to my townhouse that day to confirm that I physically had possession of a valid driver's license. The details of this arrest are explained in my First Amended Complaint dated March 16, 2005, paragraphs 24 through 29. This third arrest by the Stamford police within one year was also dismissed with prejudice after I wrote a pro se Motion To Dismiss in approximately October of 2004.

16. It has been mentioned in documents in the within Stop & Shop matter that I have "dropped" two of the three counts contained in my original complaint -- perhaps being inferred by some that those issues were dropped because they lacked merit. The three issues contained in my original Complaint, filed December 30, 2004, are as follows:

    A. Count One -- the "Stop & Shop" arrest which has always been the primary focus and is the basis of my entire Second Amended Complaint.

    B. Count Two -- the "evading responsibility" arrest referred to in paragraph 15B above which was dismissed with prejudice after I filed a pro se motion to dismiss. When I retained Arthur Laske in April, 2005, I mentioned to him that I wanted to drop this count because my damages were so inconsequential that I didn't want to spend time pursuing it in my amended complaint.

    C. Count Three -- As stated in paragraph 34 of my original complaint, the Stamford police department has an unconstitutional policy of directing cameras into the cells of female detainees which generate constant visual displays onto monitors within the police station which are being viewed by male officers. In paragraph 6 of plaintiff's original complaint, she quotes the case of *Poe v. Leonard*, 282 F.3d 123, 124 (2d Cir. 2002), in which the Court stated:

> "By 1993, it was clearly established that a police officer violates a person's Fourteenth Amendment right to bodily privacy when that officers views, photographs or otherwise records another's unclothed or partially unclothed body, without the person's consent. By 1993, it was also clearly established that a supervisor could be liable if he had actual or constructive notice that it was highly likely that his subordinate, while on duty, might violate another's right to privacy in his or her unclothed body, but the supervisor deliberately or recklessly disregarded that risk by failing to take reasonable action to prevent such a violation, and that failure caused the constitutional injury to the plaintiff."

Plaintiff continues to believe that this Count in her original complaint had a great deal of merit, but chose to eliminate it from her lawsuit for several reasons, none of which had anything to do with her belief in its merits. Plaintiff has been told that this issue will soon be included in another plaintiff's lawsuit, whose attorney obviously agrees that this policy of the Stamford Police Department is unconstitutional.

17. With reference to the conspiracy allegations of plaintiff's Second Amended Complaint involving former Asst. State's Attorney Michael Colombo (even though he is not named as a defendant because of immunity privileges), I hereby attest to the fact that conduct and comments by the defendants and Mr. Colombo while the criminal charges were pending, such as Mr. Colombo's comment that, "They're insisting on prison incarceration," caused me to suffer extreme emotional distress for which I was prescribed sleeping pills, in addition to anti-anxiety and anti-depression medication for the first and time in my life.

I hereby swear, under penalty of perjury, that the statements contained in the within AFFIDAVIT OF PLAINTIFF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, dated January 6, 2006, are true and correct.

_____
Nancy Gleis

Subscribed and sworn to before me by this 6th day of January, 2006.

Commonwealth of Massachusetts
County of Middlesex
Subscribed and sworn to before me this ___6___ day of __January__ 19 _2006_
_Colleen A. Beliveau_
Notary Public

Colleen A. Beliveau
NOTARY PUBLIC
My commission expires Sept. 25, 2009

Respectfully submitted,

_____
Nancy Gleis, Plaintiff, Pro Se
1035 S. Main Street, No. 120
Cheshire, CT. 06410
Cell Phone: (617) 894-5561

## CERTIFICATION OF SERVICE

I hereby certify that a true copy of the foregoing AFFIDAVIT OF PLAINTIFF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT has been mailed, postage pre-paid, this 9th day of January, 2006, to defendants' attorney, as follows:

James V. Minor, Esq.
Assistant Corporation Counsel
888 Washington Boulevard, Box 10152
Stamford, CT. 06904-2151
jminor@ci.stamford.ct.us

_____
Nancy Gleis